UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


INTEGRATED MANAGEMENT SYSTEMS,
INC.,

        Plaintiff,

    v.

MAHESH BASAVEGOWDA,

        Defendant.
_____/

**HONORABLE DENISE PAGE HOOD**

**No. 17-13764**


**BENCH TRIAL - VOLUME 3**
(Conducted Via Zoom Videoconferencing Software)
**Thursday, May 13, 2021**


Appearances:

John F. Rhoades                     Alari K. Adams
Dykema Gossett, PLLC               A Squared Legal Group
400 Renaissance Center            607 Shelby, #728
Detroit, Michigan  48243          Detroit, Michigan  48226
(313) 568-6810                     (313) 702-2222
  On behalf of Plaintiff             On behalf of Defendant

- - -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard*
*Detroit, Michigan  48226*
*(313)234-2604 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

**I N D E X**

Defendant's Case in Chief                          Page   Vol.

   **Mahesh Basavegowda**

       Direct Exam (Cont'd) By Ms. Adams:          4      3

       Cross-Examination By Mr. Rhoades:          17      3

Plaintiff's Closing Argument ....................38      3

Defendant's Closing Argument ....................52      3

Plaintiff's Rebuttal Closing Argument ...........59      3

Certification of Reporter .......................64

                        -    -    -

**E X H I B I T S**

     Number        Description               Id'd Rcvd Vol.

***None Marked, Offered or Received***

                        -    -    -

1    Detroit, Michigan

2    Thursday, May 13, 2021

3    11:16 a.m.

4    -   -   -

5    **THE CLERK:** Calling Case Number 17-13764, *Integrated*

6    *Management Systems, Inc. v. Mahesh Basavegowda*.

7    Counsel, please place your appearances on the record.

8    **MR. RHOADES:** Good morning.  John Rhoades for the

9    plaintiff.

10   **THE COURT:** Good morning, Mr. Rhoades.

11   **MS. ADAMS:** Good morning.  Alari Adams for the

12   Defendant.

13   **THE COURT:** Good morning, Ms. Adams.

14   We are going to proceed -- let's see.  I think

15   Mr. Basavegowda is under oath, and we're continuing.  Do you

16   have additional questions, Ms. Adams, or we're on cross?

17   **MS. ADAMS:** I have a few additional questions,

18   Your Honor.

19   **THE COURT:** Okay, all right.  Then I'm just going to

20   continue him under oath from yesterday, Mr. Rhoades.  Is that

21   agreeable to you?

22   **MR. RHOADES:** Yes.

23   **THE COURT:** Okay.  Very well.  Mr. Basavegowda, you

24   are still under oath; all right, sir?

25   **THE WITNESS:** Yes.

1    **THE COURT:**  Now I'm worried -- yes?  Okay.  Can you

2  hear us?

3    **THE WITNESS:**  Yeah, we can hear you, but not clearly.

4    **THE CLERK:**  Judge, you're freezing some.

5    **THE COURT:**  Oh, I am?  Oh, I thought -- I actually

6  connected a different way because I thought I was too -- I was

7  freezing yesterday.  Is this better?

8    **THE CLERK:**  It's not.

9    **THE COURT:**  No, it's not better?  It's not better,

10  Jim?

11    **THE CLERK:**  It's still digitizing.  We can hear you.

12    **THE COURT:**  Okay.

13    **MR. RHOADES:**  I can hear you fine.

14    **THE COURT:**  Okay.  How about you, Ms. Adams?  Can you

15  hear me and see me?

16    **MS. ADAMS:**  This is better.  Initially there was some

17  freezing, but this is better.

18    **THE COURT:**  Okay.  Let's try it.  If I start to

19  freeze again, will you let me know and I'll try to go in a

20  different way.  Okay?

21            -   -   -

22                                (11:19 a.m.)

23          **DIRECT EXAMINATION CONTINUED**

24  BY MS. ADAMS:

25  **Q.**  All right.  Mr. Basavegowda, I'm going to continue on from

1  yesterday.  I'm going to show you an exhibit.  This will be

2  Exhibit 22.  Can you see this?

3  **A.**    Yes.

4  **Q.**    And are you familiar with what this document is?

5  **A.**    Yes.

6  **Q.**    It's your offer letter from SAP?

7  **A.**    Yes.

8  **Q.**    When did this offer letter come about?

9  **A.**    So after receiving that email from my colleague, I think

10  after a couple of weeks I applied for that position, and I

11  was -- maybe another couple of weeks later I was called for an

12  interview.

13      I went through a few rounds of interviews.  The first

14  round was more on the job for which that they were planning to

15  hire, a Business Process Senior Consultant.  So that was done

16  by a couple of managers in the SAP.

17      And once I completed that interview, they called me for

18  another interview -- I don't remember the second interview

19  date -- wherein they more talk about the compensation and

20  those -- the benefits and those kind of things, and after that

21  they made this offer to me.

22  **Q.**    And are you aware of other candidates for this position?

23  **A.**    Yes.  I understand there were several other candidates.

24  They were all interviewed for this position.

25  **Q.**    And then that's your signature at the bottom?

**A.**   Right.

**Q.**   And you signed this or you accepted this offer letter on September 28, 2017?

**A.**   That's correct.

**Q.**   And what did signing this offer letter mean to you at that time?

**A.**   So that offer letter is kind of an acceptance from SAP of me taking over one of the several managerial positions at that point in time they were recruiting.  However, this was still not kind of really certain or concrete assurance of the job because I am an H-1B temporary work visa holder so that visa needs to be transferred so there will be like two more steps before that.  They have to get an LCA done.

   After I confirm this and then they will initiate the transfer of my H-1B from the current employer to new employer, and once that application is accepted, the Government -- the Immigration Department will take about -- during those times they used to take about six to eight weeks to make decisions. So once they made a decision to accept the transfer or approve the transfer, then it was like 100 percent certain that I can take this position.

**Q.**   And, going back up to the first paragraph, the last part of that first paragraph, it looks like October 16th, 2017, was crossed out, and is that your handwriting?

**A.**   Yes.

1  Q.   For October 30th, 2017?

2  A.   That's correct.

3  Q.   Then your signature on the side?

4  A.   Right.

5  Q.   And why did you cross out the initial October 16th date?

6  A.   So they made this offer and asked me to join on

7  October 16th.  However, since, as I mentioned, there were

8  several steps in the process of making this offer 100 percent

9  certain and also I know my current contract with IMSI was up

10 like the 31st, which was Tuesday of that week, so I spoke to HR

11 and asked them to change the date.  They informed me to strike

12 the date and sign it like whatever the way I write it and then

13 send it back to them.

14 Q.   Okay.  Just a second.  I'm going to show you another

15 exhibit.  This will be Exhibit 3, I think.  I hope.

16      Can you see that?

17 A.   I can see that, yes.

18 Q.   This is Exhibit 3 approximately Page 15.  This is an

19 October 10th, 2017, email that you sent to Matthew Readal --

20 that's your supervisor?

21 A.   Yes.

22 Q.   -- and a handful of other people.  Does this email

23 coincide with what you were just talking about, striking out

24 the date?

25 A.   Right, right.

1  **Q.**   So could you explain this email, if possible?

2  **A.**   So, as I said, there were several additional steps to be

3  done before any H-1B transfer can happen, and once that

4  transfer happens, then only is it like the job is 100 percent

5  certain that it is available to me.

6       So once I received this email from the HR, her name is

7  Kathleen O'Hara, I wrote to Matt saying that this is going to

8  take a few more weeks and also as a, as a courtesy I would like

9  to give two weeks' notice to my current employer, which is

10  IMSI, so I won't be able to join on the 16th.  So that is when

11  the Kathleen O'Hara called me and asked me to make those

12  changes and scan it and send it to her.

13  **Q.**   Okay.  And then moving on to Exhibit 23.  Let me see.

14       Are you able to see this email?

15  **A.**   Right.

16  **Q.**   Okay.  This was September 29, 2017, from you to Ajit, and

17  this was the day after you signed the offer letter?

18  **A.**   Right.

19  **Q.**   And what were you emailing Ajit regarding?

20  **A.**   So this is regarding the project that I was ending, which

21  was about to end on 13th of October, and since the project was

22  closing, there was no clarity.  This was on the project side.

23  There was no clarity on the further extensions, and since I

24  also knew that I was filling this full-time position and they

25  are interviewing a few more people so I notified Ajit that it

1 is unlikely my extension is going to happen for this project

2 beyond the 13th of October.

3     And, as I mentioned, since they made an offer the position

4 was not certain until the time H1-B transfer is approved so

5 meanwhile I reached out to Ajit to look for some new projects

6 and I was also searching for some projects.

7 **Q.** And then Ajit did respond just letting you know if there

8 was any updates, and you stated that he -- and what was your

9 response to Ajit's email?

10 **A.** Yeah. First, I mean I have a regular call -- I used to

11 have a regular call with Matt during that time on a weekly

12 basis so it was on a Thursday, like every Thursdays. So we

13 couldn't meet on that day, and I told Ajit no, we couldn't

14 meet. I know we will -- I will talk to him and I will respond

15 to him a little later.

16 **Q.** And then you may have said this earlier, but why didn't

17 you let Ajit know about you had signed the offer letter the day

18 before?

19 **A.** No, as I said, nothing was certain; right? It still has

20 to go through an LCA approvals, and then the LCA needs to be

21 submitted along with the H-1B, I-129 petition paper, and then

22 once that is submitted the USCICA will give you a signal saying

23 that no, we have accepted your application, and then they will

24 process the application. That will take another -- during that

25 time it used to take about six to eight weeks. So considering

1    all these things, I didn't feel that it's the right time to

2    inform Ajit.

3         So when it become kind of 50 percent certain or to a

4    certain extent where I know I can inform that is on the

5    16th of --

6    **Q.**    Right.  I'll move on to there, but in the mean time did

7    Ajit start emailing you temporary positions?

8    **A.**    Yes.

9    **Q.**    After the 29th?

10   **A.**    Yes.

11   **Q.**    Did you review and respond to those positions?

12   **A.**    Yes.

13   **Q.**    The next exhibit is Exhibit 26 hopefully.

14        And what is this document?

15        **THE COURT:**  What exhibit number is it?  Is it 26?

16        **MS. ADAMS:**  Yes, Your Honor.

17        **THE COURT:**  Okay.  Thank you.

18        **THE WITNESS:**  So once the USCICS receives the

19   application I-129, which is a petition for a non-immigrant

20   worker, they kind of send an acknowledgment, which they call as

21   a Receipt Notice, and this is that Receipt Notice, which says

22   that they received the -- sorry, this is not the Receipt

23   Notice.  This is the Approval Notice.  This was sent on like

24   27th of October, but you can see there two dates.  Like on

25   16th they received the application, and they approved it on the

1  27th so almost like a week and a half or so.

2  **BY MS. ADAMS:**

3  **Q.**   But on the 16th you received, you received notice of this?

4  **A.**   It's a different document.  It looks similar, but it's a

5  different document.  I did not receive it, but I was told by

6  SAP attorneys Fragomen that they received the Receipt Notice

7  for me.

8  **Q.**   And then on October 16th what else did you do?

9  **A.**   So after receiving that notice on the October 16th that is

10  when I first said, okay, this is the time that I should inform

11  Ajit because though still it is pending for approval, I called

12  him on the phone, I told him that SAP has made an offer, and

13  I'm going to join the -- join the company.

14  **Q.**   And what was his response to you telling him that you were

15  joining SAP?

16  **A.**   So he was, he was, he was very unhappy, and he said I

17  should not do this because even back on the time and he said

18  no, we started our relationship since April -- sorry -- yeah,

19  April 2013 and now we have come all the way, like they helped

20  me out with all of this immigration-related papers and they

21  helped me with the three attempts of H-1B, and now within

22  five months I am leaving them.  This is kind of a slap on his

23  face, and he also said it's a shame that I am doing this.

24  **Q.**   And then the next exhibit will be -- this is Exhibit 27,

25  your resignation email to Ajit.  So "as discussed yesterday",

1  and that's referring to the conversation that you had with him

2  that you just --

3  **A.**    Yes.

4  **Q.**    -- testified to?

5  **A.**    Yes.

6  **Q.**    And could you explain the contents of this email and what

7  you were trying to make him aware of?

8  **A.**    Yeah.  So after my discussion I did a formal resignation

9  email to Ajit saying, you know, "As discussed yesterday, 10-27

10  will be my last day with IMSI," and I thanked him for all of

11  the support that he provided.

12      And also, as I said, from the day of submitting the

13  application, which is the 16th of October, during that time in

14  2017 the average approval -- I mean average processing time by

15  the USCICS is about six to eight weeks so I was uncertain about

16  whether it gets approved or it gets rejected so from that sense

17  I told him there could be a break between the jobs, and the

18  intention of me saying that is to have my insurance intact

19  because I'm -- I don't have any -- I have a history of -- my

20  family has a history of heart diseases so in case of

21  uncertainty of health I asked him to make the insurance

22  extended to like 30th November.

23      And this break is not illegal.  H-1B employees can take

24  60 days off paid between the jobs legally.

25  **Q.**    But you were asking for a break on the 17th; correct?

**A.**   I'm asking the break's after 27th for two months.

**Q.**   Okay.  But did you end up taking a break?

**A.**   No.  So I -- when I sent this letter, I was not aware that SAP processed my visa using a premium processing, what they call is a premium processing, which generally they take about two weeks to complete the processing.  This premium processing comes with an additional cost and SAP did that and because of that I could get the Approval Notice on the 27th and I was able to join on next Monday, which was the 30th of October.

**Q.**   So, just to clarify, on the 17th you thought you were going to need to take a break, but you ended up not having to?

**A.**   I'm sorry, can you repeat that?

**Q.**   When you sent this email, you thought you were going to have to take a break, but when the 27th came, you didn't need a break?

**A.**   There was no need, yeah.

        **MR. RHOADES:**  Objection to the leading question.

        **THE COURT:**  It is leading, but he's essentially testified to that.  Your objection is noted and preserved for the record.

        Please continue, Ms. Adams.

        **THE WITNESS:**  So after I sent this --

        **THE COURT:**  No, no, no, no.  Excuse me.  Ms. Adams, pose a question.

**BY MS. ADAMS:**

**Q.**   After you sent this email to Ajit, did he respond at all?

**A.**   Yeah, he called me back after I think about 45 minutes or an hour later after I send this letter, and he told me I am really serious, I have signed the contract, they can drag me to the court, and he also said if we drag you to the court forget about your green card.

       **THE COURT:**   I'm sorry, he said what relative to your green card?

       **THE WITNESS:**   What he said is like, you know, if they drag, like if IMSI drags me to the court, he said forget getting your green card.

       **THE COURT:**   Okay.

       **THE WITNESS:**   And after that -- yeah, I mean it pretty much ended like that.  Mostly he was talking and I was listening.

**BY MS. ADAMS:**

**Q.**   And so we know the 27th was your last day, and then you did start work with SAP on the 31st or the 30th?

**A.**   I started on the 30th, but -- yeah.

**Q.**   And when did you sign an employment agreement with SAP?

**A.**   I signed the appointment letter --

       **MR. RHOADES:**   Objection -- sorry to interrupt.  I'm objecting to the relevance of this line of questioning.  It's already been stipulated in the pretrial order that this witness

accepted employment with the end-client during the term of the noncompete so I don't see the relevance of this line of questioning.

 **THE COURT:** How is it relevant?

 **MS. ADAMS:** He -- well, he just testified that his acceptance was contingent on several factors so I'm just asking when the actual employment became finalized.

 **THE COURT:** Okay. That's a little bit different question, but is that part of the stipulated facts?

 **MS. ADAMS:** No.

 **MR. RHOADES:** It's, it's, it's stipulated that he accepted employment during the term of the noncompete, and this is a -- appears to be a line of questioning directed to a new defense that hasn't been briefed, is not in the pretrial order, is not an issue for this Court to decide.

 **THE COURT:** And that would be what, that he didn't become employed during the noncompete?

 **MR. RHOADES:** Right, which has already been stipulated to.

 **THE COURT:** Okay. So, Ms. Adams, I'm going to let you ask this question, but if there's a stipulated fact that this question makes unstipulated, I think I have to consider the stipulated facts; okay?

 **MS. ADAMS:** Okay.

 **THE COURT:** All right. Very good. You may answer.

1  **BY MS. ADAMS:**

2  **Q.**   When did you sign the employment agreement?

3  **A.**   So I got it like after joining them I think the first week

4  of November.

5  **Q.**   Okay.  And, moving back a little bit, did you ever ask

6  IMSI for any type of assistance when you came over?

7  **A.**   Yeah.  So on 17th of March, 2017, while I was still in

8  India I wrote an email to Ajit, you know, asking him for an

9  assistant with a salary at once of $5,000 to cover my initial

10 expenses like rental advance and, you know, down payment on my

11 car and, you know, those kind of things.  However, I did not

12 get any response from Ajit on that.

13 **Q.**   And, lastly, would the damages sought by Plaintiff cause

14 you significant hardship?

15 **A.**   Oh, yeah, this -- because it's too much.  Like probably

16 for me it will take about five years to make such a savings,

17 you know, you want to know -- consider.

18         **MS. ADAMS:**  I have no further questions for

19 Mr. Basavegowda at this time, but I reserve the right to

20 redirect, if necessary.

21         **THE COURT:**  Okay.  All right.  Very good.

22     Mr. Rhoades, do you want to cross-examine?

23         **MR. RHOADES:**  Yes.

24                     -   -   -

25

1                                                          (11:42 a.m.)

2                          **CROSS-EXAMINATION**

3    **BY MR. RHOADES:**

4    **Q.**   Good morning, Mr. Basavegowda.

5    **A.**   Good morning, John.

6    **Q.**   You are employed at SAP America currently; correct?

7    **A.**   Yes.

8    **Q.**   You have been employed there since October 30, 2017?

9    **A.**   That's true.

10   **Q.**   What is your current salary?

11   **A.**   Current salary should be around 140K.

12   **Q.**   Is that your base?

13   **A.**   No, that includes some benefits as well.

14   **Q.**   Okay.  And, 140K, that's consistent with the amount in the

15   offer letter that you received from SAP America in

16   September 2017; right?

17   **A.**   Yeah.  I mean there was some increments in the last

18   three years so initially it was about 121K and now it has come

19   to around 140K.

20   **Q.**   Okay.  Well, hold on a second.  I want to make sure I

21   understand your answer.

22        So I want to go back to Exhibit 22, which is the

23   September 21st offer letter that you just testified you signed

24   on September 28, 2017.  Do you recall that testimony?

25   **A.**   Uh-huh, yes.

1  **Q.**   Can you see this document?

2  **A.**   Yes.

3  **Q.**   And in this letter you were offered a base salary of

4  126,000, plus a target bonus of 14,000, for a total target cash

5  package of 140,000 in compensation; correct?

6  **A.**   Right.

7  **Q.**   Has your salary and base -- or excuse me.  Has your

8  compensation from SAP increased in either 2018, 2019 or 2020?

9  **A.**   Yes.  All three years it increased.

10  **Q.**   In what amounts?  Maybe a better way of asking the

11  question is what was your total income received from your

12  employer SAP in the years 2017, if you know, and 2018, 2019 and

13  2020?

14  **A.**   I can't give an accurate number, but I can say like 2017

15  was only for two months so it should be like about $24,000,

16  25,000, and on an average I got about 1 to 1.5 percent increase

17  for a period of time so ...

18  **Q.**   Did you receive a bonus in each of those years?

19  **A.**   I did receive bonus, but it was not even close like what

20  was mentioned in the letter.

21         **THE COURT:**  I'm sorry, I misunderstood.  You did or

22  did not receive a bonus in those years?

23         **THE WITNESS:**  I did receive bonus in all these years.

24  I have been receiving the bonus, but the bonus amount varies

25  depending on the performance of the company, and also I did not

1   receive exact like, for example, in 2017 I did not receive any

2   bonus at all because my contribution was only for two months,

3   and for 2018, '19, '20 it was less than 100 percent so it was

4   not 14,000 all the time.

5   **BY MR. RHOADES:**

6   **Q.**   Okay.  So --

7            **THE COURT:**  So how much was it?

8            **THE WITNESS:**  So I know for sure this year it was

9   113 percent.  I think it should be around $16,000.  The

10  previous year was -- it was 90 percent or something like that.

11  I will have to check.  I was not prepared for this question.

12  **BY MR. RHOADES:**

13  **Q.**   And so your initial base salary was 126,000, what did it

14  increase to in 2018 or 2019?

15  **A.**   So on an average it is 1 to 1.5 percent so I don't

16  remember exactly how much percentage of increase I got in all

17  of those years.

18  **Q.**   Okay.  So 1 percent of 126,000 would be $12,600 -- does

19  that sound about right -- for the first increase that you

20  received for the first year from -- so that would take you from

21  126 to about $138,600 for 2018?

22  **A.**   It's possible.

23  **Q.**   As your base salary, and then you received some bonus on

24  top of that; right?

25  **A.**   Right.

1 **Q.** And then for 2019, if your salary was about 138,600,

2 1 percent of that is 13,860, so -- well, I -- you know, we

3 could do the math later, but that's a lot of money. That would

4 equate to over $500,000 over those three years; right?

5 **A.** Yes.

6 **Q.** You signed the employment agreement which is Exhibit 1;

7 correct?

8 **A.** Right.

9 **Q.** You read and speak English; correct?

10 **A.** Yes.

11 **Q.** This employment agreement is one page; right?

12 **A.** Yes.

13 **Q.** And that's your signature at the bottom?

14 **A.** Yes.

15 **Q.** Do you see the word "noncompete" here in bold and

16 italicized letters?

17 **A.** Right.

18 **Q.** And you agreed to these same terms when you received these

19 same terms in October of 2016 before coming to the

20 United States; right?

21 **A.** That's correct.

22 **Q.** And you signed an agreement with identical policies and

23 terms in October of 2016; right?

24 **A.** That's correct.

25 **Q.** And we have looked at that document, which is part of

1  Exhibit 4, but I'll show it to you just briefly to confirm what

2  we're talking about.

3      So here we go.  It looks a lot like what we were just

4  looking at; right?

5  **A.**   Yes.

6  **Q.**   This is the same noncompete provision that you saw and

7  signed in October 2016; right?

8  **A.**   Yes.

9  **Q.**   And that's your signature at the bottom of this page;

10  correct?

11  **A.**   That's correct.

12  **Q.**   And in this agreement and in the one with the identical

13  terms and conditions that we were just looking at, you

14  acknowledge you had the opportunity to consult with legal

15  counsel in the last paragraph; do you see that?

16  **A.**   Yeah, but in the first offer letter of 2016 I was told

17  this offer letter was for the purpose of visa and I was in

18  India --

19  **Q.**   That's not my question.  I'm just asking if you

20  acknowledged the opportunity to consult with legal counsel in

21  each of these agreements.

22  **A.**   When I signed that, I did not read this document

23  completely.

24  **Q.**   Oh, you didn't read this document completely in

25  October 2016?

1    A.    Yes.

2    Q.    And you also didn't read it completely in April of 2017?

3    A.    Yes, and I mentioned the circumstances in my testimony.

4    Q.    You stipulated in this case that you were employed by

5    IMSI, the Plaintiff, under the terms of this employment

6    agreement; right?

7    A.    Yes.

8    Q.    That's Stipulated Fact Number 13.  IMSI, as your employer,

9    paid your salary; correct?

10    A.    So they started paying salary after I started billing

11    for --

12    Q.    I didn't ask you when they started.  I just said:  As your

13    employer IMSI paid your salary; right?

14    A.    Yes.

15    Q.    And IMSI provided you with medical and life insurance;

16    correct?

17    A.    That's correct.

18    Q.    You worked as IMSI's employee at SAP's location in

19    Pittsburgh starting in April 2017; right?

20    A.    Yeah.  I started at SAP Pittsburgh location, but I --

21    after three days I started working for SAP's customer in the

22    suburbs of Pittsburgh, not in SAP office.

23    Q.    On July 31st, 2017, you received an email from

24    Sachin Bhatt, an employee with SAP in Pittsburgh, with a link

25    to the SAP job posting for your project manager position;

1  right?

2  **A.**    Yes.

3  **Q.**    And you testified about that yesterday.  That's part of

4  Exhibit 3, which we're looking at now.  This is the

5  July 31st email; right?

6  **A.**    Yes.  So this is the link that I got from Sachin Bhatt,

7  who is, who is my team member, used to be my team member, and

8  he was a full-time member of SAP at that point in time.  The

9  link --

10  **Q.**    I didn't ask you a question about the link.

11  **A.**    Okay.

12  **Q.**    You were an IMSI employee at the time you received this;

13  right?

14  **A.**    Yes.

15  **Q.**    SAP was seeking a permanent employee to fulfill the

16  project manager role you had there; right?

17  **A.**    Not for the role that I had.  This link is for multiple

18  roles in that SAP office location.

19  **Q.**    I'm going to show you now as part of Exhibit 32, which is

20  an affidavit that you submitted in this case --

21          **THE COURT:**  This is Exhibit 32?

22          **MR. RHOADES:**  This is part of Exhibit 32.  It's also

23  filed with the court as ECF Number 16-1, Affidavit of

24  Mahesh Basavegowda.

25

1  **BY MR. RHOADES:**

2  **Q.**   And at Paragraph 10 you say -- or you swore in this

3  affidavit that SAP sought a permanent employee to fulfill this

4  role, Project Manager position; right?

5  **A.**   So, as I said, it was multiple roles, including --

6  **Q.**   Did I read that incorrectly?  The first sentence says,

7  "Evidently, with the contract Project Manager position ending

8  in a few months, SAP sought a permanent employee to fulfill

9  this role."

10        Did I read your affidavit correctly?

11 **A.**   Yes.

12        **THE COURT:**   What line is it again?

13        **MR. RHOADES:**   That's Paragraph 10 of ECF Number 16-1,

14 which is marked as Exhibit 32.

15        **THE COURT:**   Okay.  Great.  Thank you.

16 **BY MR. RHOADES:**

17 **Q.**   And you then say in the next paragraph that you formally

18 applied for that position in August 2017; correct?

19 **A.**   Right.

20 **Q.**   And then, just to get the chronology down, SAP sent you

21 the offer letter for that full-time employment on

22 September 21st, 2017, which we were just looking at a moment

23 ago; right?

24 **A.**   Right.

25 **Q.**   That's Exhibit 22.  And you stipulated and testified that

1   you signed this offer letter on September 28th, 2017; right?

2   **A.**   Yes.

3   **Q.**   That's Stipulated Fact 16.

4        And in your employment agreement, which you signed in

5   October 2016 and April of 2017, you agreed not to enter into

6   any employment agreement directly with Plaintiff's end-client,

7   with IMSI's end-client, or with any contract company who

8   provides similar services for a minimum period of 24 months

9   after start of employment with IMSI for an end-client; right?

10  **A.**   Right.

11  **Q.**   That's what this document says, and that's also Stipulated

12  Fact 14.

13       And you stipulated in Stipulated Fact 18 that on

14  October 27th, 2017, you resigned your employment with IMSI

15  after accepting direct employment with IMSI's end-client SAP

16  after approximately six months of employment; right?

17  **A.**   That's correct.

18  **Q.**   With regard to your immigration to the United States, IMSI

19  provided you with valuable guidance and support during your

20  transition from India to the U.S.; right?

21  **A.**   Yes.  I paid for that.

22  **Q.**   They provided you with valuable guidance and support;

23  correct?

24  **A.**   Yes, and I paid for that service.

25  **Q.**   In fact, in Exhibit 27, your October 17th email, you

1  described IMSI as an esteemed organization; correct?

2  **A.**    That's correct.

3  **Q.**    And you thanked Mr. Makhecha for -- in particular for the

4  valuable guidance and support during my transition from India

5  to the USA; correct?

6  **A.**    Yes.

7  **Q.**    And you have also agreed to Stipulated Fact Number 7, that

8  IMSI applied for an H-1B visa on your behalf in years 2014,

9  2015 and 2016 through the immigration lottery; right?

10 **A.**    That's correct.

11 **Q.**    And you obtained your H-1B visa to work in the

12 United States through IMSI's sponsorship; right?

13 **A.**    That's correct.

14 **Q.**    And you could not have obtained that visa without a

15 sponsor; right?

16 **A.**    That's correct.

17 **Q.**    You applied for SAP's full-time Project Manager position

18 directly with SAP in August 2017; right?

19 **A.**    That's correct.

20 **Q.**    But you did not tell IMSI at that time that you had

21 applied for a job with its customer; right?

22 **A.**    I just had an offer letter so I didn't -- I mean it was

23 not certain to inform so I didn't.

24 **Q.**    So, just to be clear, in August 2017, after you applied

25 for the full-time position with your employer's customer, you

1  did not inform your employer; correct?

2  **A.**   As I said, the offer letter was --

3  **Q.**   That's just a yes or no.  That's a yes-or-no question.

4  **A.**   Yes.

5  **Q.**   Yes, what I said is true; you did not inform them?

6  **A.**   No, I did not inform them on that date of -- the day I

7  received the offer letter.

8  **Q.**   You did not inform them in August 2017 or in

9  September 2017; right?

10  **A.**   No, I did not.

11  **Q.**   And Exhibit 22, the offer letter that you signed on -- we

12  have established on September 28th; right?

13  **A.**   That's correct.

14  **Q.**   And the next day, September 29, you send this email to

15  Mr. Makhecha and you say, "Get to hear that now SAP is trying

16  to fill my position on a full time and my extension with SAP

17  looks unlikely," but that's not a true statement; right?

18      I mean you weren't under oath when you wrote this email,

19  but you are now, and I'm asking you was it -- was it a true

20  statement to tell Mr. Makhecha that it looks unlikely your time

21  with SAP would be extended the day after you accepted an offer

22  to work there?

23  **A.**   But that's a true statement because the contract position

24  there, it was unlikely that they were going to extend.

25  **Q.**   The first line of this offer letter, Exhibit 22, says,

1  "SAP is pleased to offer you employment as a Business Process

2  Senior Consultant based out of our Pittsburgh 6th Avenue office

3  and reporting to Matthew Readal.  Your start date with SAP

4  America is" -- originally it said October 16, 2017; right?

5  **A.**   That's correct.

6  **Q.**   So you have an offer letter, you signed it, you have a

7  start date, yet the following day after you signed that

8  acceptance letter you say your extension there seemed unlikely?

9  **A.**   Extension as a contract position is definitely unlikely.

10  **Q.**   Oh, is that what you told Mr. Makhecha when you sent that

11  September 29th email?

12  **A.**   Yeah, that's what it is -- right, like if you read that

13  email.

14  **Q.**   So you don't, you don't think there's anything -- you

15  don't think there's any hiding the ball here, you think this is

16  a completely honest and open email about your expected

17  employment with your employer's customer after you had just

18  signed that employment agreement?

19  **A.**   I did not inform IMSI that, you know, there is an offer

20  being made.  However, I did not lie, and I did not conspire

21  anything here so I just told like based on the things that were

22  happening the contract role is unlikely to get extended beyond

23  10/13.

24  **Q.**   Okay.  So you think that was technically true even though

25  you concealed the fact that you signed and accepted an

1  employment offer the day before?

2  **A.**    Can you repeat that question?

3  **Q.**    You think, you think this statement in your email to

4  Mr. Makhecha is technically true because the contract position

5  was ending and you were expecting to fill it through the offer

6  letter you signed the day before; right?

7  **A.**    Technically correct because it was just an offer letter

8  and it was still subject to the variable steps of immigration

9  process.  So although there was an offer, it was unlikely -- or

10  there were possibilities that, no, I couldn't have -- I could

11  have a rejection of my H-1B transfer, and in that -- and in

12  that event SAP already had a couple of consultants lined up in

13  case I don't make it.  So whether I would have taken this offer

14  or if I wouldn't have taken this offer, SAP would have filled

15  that position by somebody else, either with me or someone.

16  So --

17  **Q.**    You could have told Mr. Makhecha that you had the day

18  before accepted a job offer from IMSI's customer; right?

19  **A.**    Excuse me.  No.  As I said, no, it was no --

20  **Q.**    What prevented you -- excuse me, I need an answer to my

21  question.  What prevented you --

22              **MS. ADAMS:**  Objection, asked and answered.

23              **THE COURT:**  And you're becoming argumentative so

24  don't cut him off, let him answer, unless you think the answer

25  is not responsive, to which you make an objection to the Court.

1    Okay?

2              **MR. RHOADES:**  Very good.

3              **THE COURT:**  What's your question --

4              **MR. RHOADES:**  I can rephrase.

5              **THE COURT:**  Mr. Rhoades, excuse me, pose your

6    question again, and, Mr. Basavegowda, please answer it

7    directly; all right?

8              **THE WITNESS:**  Yes.

9    **BY MR. RHOADES:**

10   **Q.**   My question is simply could you have told Mr. Makhecha at

11   this time that you had signed the employment offer letter from

12   SAP the day before?

13   **A.**   I couldn't because that employment offer letter alone will

14   not ensure me the position at SAP for that full-time position

15   that I had been interviewed and offered.

16             **THE COURT:**  Go to your next question.

17   **BY MR. RHOADES:**

18   **Q.**   And you had known about the job since July -- the job

19   opportunity since July of 2017; right?

20   **A.**   Yes.

21   **Q.**   But you didn't tell your employer about it in July or

22   August or in this email in September of 2017?

23             **MS. ADAMS:**  Objection, asked and answered.

24             **THE COURT:**  Not in that way, Ms. Adams.  I'm going to

25   allow it.

1    You may answer, sir.

2         **THE WITNESS:**  No, I did not.

3  **BY MR. RHOADES:**

4  **Q.**   If you hadn't read your employment agreement and you

5  didn't think you were subject to a noncompete, why wouldn't you

6  tell your employer that you were taking a job with your

7  employer's customer?

8  **A.**   So there were all initial stages.  You know, forget about

9  SAP.  If, let's say, I would have found an opportunity to take

10  some, example, let's say at Accenture or at Allied, I wouldn't

11  tell anyone about it, particularly to my current employer,

12  until the time that it becomes 100 percent certain that I'm

13  taking that position.

14       As I said, there are several steps unlike a permanent

15  resident or a local U.S. citizen, who can take an offer and

16  quickly inform their current employer.  In my case it takes

17  several weeks or months before it can actually become certain.

18       So just by knowing that there is an opportunity, just by

19  applying an opportunity, just by getting an offer letter, for a

20  temporary worker with an H-1B it is not certain that he is

21  going to get that job.  So when I wrote this email on that

22  particular day, it was not 100 percent that I am getting that

23  job.

24  **Q.**   So on -- this is Exhibit 25.  On October 13 SAP through

25  attorneys petitioned to transfer your visa; right?

1   **A.**   Yes.

2   **Q.**   And --

3         **THE COURT:**   What exhibit is this?

4         **MR. RHOADES:**   This is Exhibit 25.

5         **THE COURT:**   Okay.

6   **BY MR. RHOADES:**

7   **Q.**   And you were testifying with regards to Exhibit 26, which

8   I'll show you again, which shows that SAP America received

9   notice that the visa transfer was approved on October 16, 2017;

10   right?

11   **A.**   Sorry, that is not approved. That is receipt date.

12   Approved was the date that you can see below that is 27th of

13   October.

14   **Q.**   Understood. So they received notice of the approval on

15   the -- on October 16th; right?

16   **A.**   No, this is just a Receipt Notice, just an acknowledgment

17   that they have received the application and the application is

18   under process.

19       And then they --

20   **Q.**   It says the notice is valid from October 30, 2017 to

21   October 6, 2020; right?

22   **A.**   Sir, I'm referring to the date 10/16. 10/16 is when they

23   accepted the application, and then they took two weeks in this

24   case to process the application and uprule it. And on the 27th

25   they uprule it, and the uprule is effective from 30th of

1   October until like 6th of October 2020.

2   **Q.**   And the day, the day after October 16th, the

3   received date, you send your resignation email to

4   Mr. Makhecha -- right-- on October 17th?

5   **A.**   Yeah.  The day that I got -- in fact, the document that

6   you showed previously, I did not see that document until I

7   joined the company.  They shared -- I mean SAP, they shared the

8   document later, like sometime in November, that I found that

9   document, but I was told by the SAP HR that on

10  October 16th they issued a Receipt Notice, and the moment I get

11  to know that they got a Receipt Notice I called Ajit and I

12  informed him and I told him I am joining SAP.

13  **Q.**   I understand.  So you say you didn't receive that

14  document, but you were informed on October 16th that the visa

15  transfer was approved and you called Mr. Makhecha?

16  **A.**   That's correct.

17  **Q.**   And then you sent him this email the following day?

18  **A.**   Yeah.  I called him, and I told him I accepted an offer

19  from SAP.  I clearly told him I accepted an offer from SAP, and

20  the following day I sent this email to -- as a formal

21  resignation.

22      And four days later they reached out to, you know, an

23  attorney Mr. Noha [sp] and they sent me a notice through email

24  on a Friday asking me to withdraw my opportunity that I got and

25  rejoin IMSI.  And Immigration, they also sent an overnight Fed

1  Ex to me and also to SAP as a copy that they will send this

2  notice to me.

3       So IMSI was -- IMSI, I'm not sure, but Ajit did know that

4  I accepted an offer from SAP on 16th of October.  So if they

5  are saying that they discovered -- if they say that they

6  discovered this during the discovery phase, then they -- it's a

7  false statement.

8  **Q.**    But you didn't tell him that in this email; right?

9  **A.**    No.  Not in this email, no.

10  **Q.**    And I think we have already established, but just to be

11  clear, you did not in fact take a break between jobs --

12  **A.**    It was not necessary.

13  **Q.**    Hold on, I'm not done with my question.

14  **A.**    Sorry, sir.  Sorry.

15  **Q.**    That's okay.  Because you started at SAP on October 30th,

16  which was the Monday after October 27th, which you said was

17  your last day at IMSI; right?

18  **A.**    That's correct.

19  **Q.**    And you admit and have stipulated to in this case that the

20  noncompete agreement you signed restricted you from taking

21  direct employment with SAP for two years; right?

22  **A.**    Yes.

23  **Q.**    It's Stipulated Fact 14.

24       Is it still your sworn testimony that you didn't become

25  aware you were subject to a noncompete that was one-page long

1   and that you signed in October of 2016 and April of 2017?

2   **A.**   I became aware of it on October 17th after Ajit, you know,

3   mentioned that, you know, they might drag me to the court.  So

4   that is when I went and I looked into the offer letter in

5   details.  That is the first time I really got into it and read

6   the -- each sentences.

7   **Q.**   So we talked about how you thanked IMSI for the valuable

8   guidance and support they provided to you to get from India to

9   the USA; right?

10  **A.**   I already answered that question.

11  **Q.**   And you took advantage of that valuable guidance and

12  support to secure direct employment with SAP; right?

13  **A.**   I paid for that.  If you look at the testimonies done so

14  far, I paid for that service, and there was my efforts as well.

15       And this is kind of a goodwill email that generally

16  everyone writes to their current employer thanking them for,

17  you know, whatever their service.  I'm not denying that they

18  did not provide any guidance or support, that they took this

19  money from me and there was some effort from my side as well to

20  come to U.S.

21       So this letter is kind of a goodwill letter that whenever

22  I left any company I always thank that company for whatever the

23  support that they provide during that time so I'm not denying

24  that.

25  **Q.**   But just five months after starting employment with IMSI

1  with their customer, SAP, you thanked them for their valuable

2  guidance and support immediately after or shortly after you had

3  accepted employment with their customer, which was the

4  one company you agreed not to take a job with under the

5  noncompete; right?

6  **A.**   So I would have written the same email even if I would

7  have resigned after like 24 months or five years.

8          **MR. RHOADES:**  I have no further questions at this

9  time.

10          **THE COURT:**  Okay.  Thank you.

11      Is there redirect?  Ms. Adams, do you have redirect?

12      Please take down the document.

13          **MS. ADAMS:**  Just one second, Your Honor.  I'm just

14  trying to go through my notes.

15      No redirect, Your Honor.

16          **THE COURT:**  All right.  Very well.  Thank you.

17      Do you have any other witnesses that you're going to call,

18  Ms. Adams?

19          **MS. ADAMS:**  No, Your Honor.

20          **THE COURT:**  Okay.  Mr. Rhoades, do you have rebuttal?

21          **MR. RHOADES:**  Well, my proposal would be that we take

22  a short break, and I would like to discuss that with my

23  clients, and maybe now is a good time to have a short lunch

24  break.

25          **THE COURT:**  Oh, okay.  By "short lunch break," what

1   were you anticipating?

2          **MR. RHOADES:**  Whatever the Court prefers, but

3   20 minutes?

4          **THE COURT:**  Ms. Adams?

5          **MS. ADAMS:**  That's fine.  What are we discussing

6   during this break so I know what to plan, anticipate?

7          **THE COURT:**  He wants to ask his clients whether or

8   not they need rebuttal.  Is that a fair statement, Mr. Rhoades?

9          **MR. RHOADES:**  Yes.

10         **THE COURT:**  Okay.  Do you have any objection,

11  Ms. Adams?

12         **MS. ADAMS:**  No, Your Honor.

13         **THE COURT:**  Okay.  So 20 minutes is good for you?

14         **MR. RHOADES:**  Yeah, that would put us at --

15         **THE COURT:**  I was asking Ms. Adams because I thought

16  you said 20 minutes was --

17         **MR. RHOADES:**  Yeah, I did.  Yeah.

18         **THE COURT:**  Ms. Adams, is that good for you?

19         **MS. ADAMS:**  Yes.  So, what, 12:35?

20         **THE COURT:**  Yeah, except I'm going to probably make

21  it 12:36 because first I'm going to ask Ms. Ward if that's

22  enough time for her.

23         **COURT REPORTER:**  Yes, it's fine.

24         **THE COURT:**  Okay.  Very good.  So I'll see you all

25  back here in 20 minutes, and that will be 12:36.  Okay?

1    **MS. ADAMS:**  Okay.

2    **THE COURT:**  All right.  Thank you.

3    **THE CLERK:**  Court is in recess.

4    (Recess from 12:17 p.m. to 12:37 p.m.)

5    **THE COURT:**  Are you going to have rebuttal?

6    **MR. RHOADES:**  No, the Plaintiff does not need to call

7    any rebuttal witnesses.

8    **THE COURT:**  Okay.  And do you all want to have oral

9    argument?

10   **MR. RHOADES:**  The plaintiff is prepared to make a

11   closing argument if the Court would like to hear it.

12   **THE COURT:**  Okay.  And, Ms. Adams, are you prepared

13   to make a closing argument?

14   **MS. ADAMS:**  I wasn't, but I can if the Court requests

15   one.

16   **THE COURT:**  Okay.  All right.  Very well.  Let's

17   proceed then.

18   Plaintiff will make a closing argument first, I think.

19   **MR. RHOADES:**  Thank you, Judge.  Yes, I'm ready to

20   go.

21   **THE COURT:**  Okay.

22   **MR. RHOADES:**  This is a very simple case.  Plaintiff

23   brings one count for breach of contract, and the only defense

24   for the Court to consider under the Joint Final Pretrial Order

25   is whether the noncompete protects a reasonable competitive

1   business interest.

2          The parties have stipulated in that order that there are
3   only two narrow questions before the Court:  Whether the
4   noncompete protects a reasonable competitive business interest
5   and what damages are owed.

6          So there's been a lot of exhibits and testimony that are
7   not relevant to those two narrow issues that are before the
8   Court, and the Court should take that into consideration in
9   evaluating the evidence.

10         The reasonableness of a noncompete provision is a question
11  of law where relevant facts are undisputed.  That's the holding
12  of *Certified Restoration Dry Cleaning Network, L.L.C. v.*
13  *Tenke Corp.*, 511 F.3d 535 at 547, Sixth Circuit, 2007.

14         Here, the relevant facts are undisputed.  The following
15  are the key facts which have all been stipulated to in the
16  Joint Final Pretrial Order.

17         Number 1, Defendant signed the employment agreement.  The
18  employment agreement is Exhibit 1, and that's Stipulated Fact
19  Number 12.

20         Number 2, Plaintiff employed Defendant under the terms of
21  that agreement, paid him and provided him medical and life
22  insurance.  That's Stipulated Fact 13.

23         In that agreement Defendant agreed not to enter into any
24  employment agreement directly with Plaintiff's end-client or
25  through any other contract company who provides similar

services for a minimum period of 24 months after start of
employment with Plaintiff for an end-client.  That's Stipulated
Fact Number 14.

     The agreement further states that should defendant resign
or terminate with Plaintiff prior to the 24-month minimum
period, in consideration of the benefits that he is deriving,
he shall pay a lump sum amount of liquidated damages equal to
two years of gross margin based on Plaintiff's project billing
rate to cover the loss of business.  That's Stipulated Fact 15.

     Stipulated Fact 16 is that Defendant accepted that offer
on September 28th, 2017 and began employment with SAP on
October 30 of 2017.

     And the last stipulated fact I'll mention is Number 18.
On October 27, 2017, Defendant resigned employment with
Plaintiff after accepting direct employment with Plaintiff's
end-client, SAP, after approximately six months of employment
with the Plaintiff.

     None of that's in dispute.  There are no questions of fact
as to any of those key issues.

     Michigan's noncompete statute, MCL 445.774a, expressly
permits noncompete agreements that protect a reasonable
competitive business interest.  It provides as follows:

          "An employer may obtain from an employee an agreement
          or covenant which protects an employer's reasonable
          competitive business interests and expressly

1    prohibits an employee from engaging in employment or

2    a line of business after termination of employment if

3    the agreement or covenant is reasonable as to its

4    duration, geographical area, and the type of

5    employment or line of business."

6    Here, Defendant twice agreed IMSI's simple noncompete

7    provision -- to IMSI's simple noncompete provision in a

8    one-page policies and terms document he signed in both October

9    of 2016 and then again in April of 2017.

10    Protecting customer relationships and goodwill are

11    reasonable competitive business interests under Michigan law.

12    Indeed, the Sixth Circuit, interpreting Michigan law in a

13    published opinion that is binding precedent for this Court,

14    held that an employer -- "An employer has a reasonable business

15    interest in protecting its goodwill and, specifically, in

16    restricting its former employees from enticing away the

17    employer's old customers."

18    That's Certified Restoration Dry Cleaning again at

19    Page 548.

20    As the Michigan Court of Appeals held as recently as July

21    of 2020, "[E]mployers have legitimate business interests in

22    restricting former employees from soliciting their customers."

23    *Total Quality v. Fewless*.  That's a 2020 Michigan Court of

24    Appeals case cited in our pretrial brief.

25    Further, as other federal courts have noted, "[A] critical

1  component of [a] staffing company's goodwill is its ability to

2  preserve ongoing relationships with the employee-resources."

3  That's the *Prithvi Catalytic* case, which is also cited in our

4  brief.

5      Here, it is not disputed that Defendant resigned his

6  employment during the term of the noncompete and accepted

7  employment with the Plaintiff's end-client, thereby depriving

8  Plaintiff of both a paying customer and a valuable employee

9  resource.  Plaintiff has a business interest in protecting its

10 goodwill, protecting its customers and preserving its employee

11 resources.

12      Protecting a customer relationship for a staffing company

13 necessarily includes protecting an employee from cutting out

14 the staffing company and taking direct employment with the

15 customer.  This is why so many courts across the country have

16 held that preventing what is sometimes called disintermediation

17 is a business interest that noncompetes can and should protect.

18 These are the business interests plaintiff seeks to protect

19 here.

20      Defendant appropriated both Plaintiff's customer obviously

21 by taking direct employment there, and Plaintiff's goodwill by

22 taking advantage of Plaintiff's enormous investment of time and

23 effort in bringing him here to the United States and then

24 depriving Plaintiff of his sophisticated and valuable skills by

25 accepting a job with the one company he agreed not to take a

1  job with.

2      Defendant could not have obtained that opportunity with

3  SAP in Pittsburgh without the "valuable guidance and support"

4  he admits IMSI provided him through his transition from India

5  to the United States.  Those are his words, "valuable guidance

6  and support."

7      Defendant admits in his testimony to this Court that he

8  was in "constant touch" with Mr. Makhecha and that getting a

9  visa stamp to come to the AUSA was "very essential."

10     Indeed, Defendant also admits that he could not have

11 obtained an H-1B visa without IMSI's sponsorship.  He needed

12 IMSI's help and IMSI gave him that help, that valuable guidance

13 and support, by guiding him and helping him every step of the

14 way over a four-year period, spending at least 302 hours

15 conservatively estimated on Exhibit 35 of time and energy

16 bringing him to the United States as an IMSI employee.

17     Although Plaintiff had a firm purchase order and an offer

18 letter from Altimetrik, Defendant requested to work at SAP in

19 Pittsburgh.  Defendant began negotiating a placement there --

20 excuse me.  Plaintiff began negotiating a placement there on

21 Defendant's behalf in February 2017 prior to Defendant's

22 arrival in the United States in April.

23     Plaintiff did not need to place Defendant there, as

24 Defendant was very employable and there were many other

25 opportunities in addition to the firm offer from Altimetrik.

1    Whether SAP America was an existing customer or a new

2  customer of IMSI or whether Defendant helped with the placement

3  there in a team effort with Mr. Makhecha, as he testified, is

4  irrelevant.  The relevant undisputed fact is that SAP was

5  IMSI's customer when Defendant accepted a job there in

6  violation of his noncompete, which he did just five months

7  after starting employment with IMSI at that location in

8  Pittsburgh.

9    After IMSI accommodated Defendant's request to work onsite

10  with SAP in Pittsburgh, Defendant was in a position to unfairly

11  appropriate IMSI's goodwill and unfairly compete with IMSI, and

12  that is exactly what noncompetes are designed to prevent.

13    Defendant's testimony in part lacks credibility given his

14  less than forthright representations to Plaintiff at the time

15  of his resignation, but it is also full of distractions that

16  are not relevant to the simple legal question before the Court

17  of whether the noncompete protects a reasonable competitive

18  business interest.

19    The evidence shows that Defendant secretly planned to take

20  direct employment at SAP while he was IMSI's employee as early

21  as July 2017.  He received notice that SAP was hiring for his

22  position full time in July 2017, applied for that direct

23  employment with IMSI's customer in August 2017, and accepted

24  the position in September 2017, all without telling IMSI.

25    These clandestine efforts to cut out IMSI strongly

1  indicate that Defendant was well aware that he was subject to

2  the one-page noncompete agreement he admits signing twice but

3  denies reading.

4      His concealed application for employment with SAP and

5  repeated efforts to hide his acceptance of direct employment

6  with that end-client strongly suggests that he knew he was

7  subject to a noncompete.  Why else would he lie to IMSI by

8  asserting that his extension with SAP looks unlikely the day

9  after he signed the SAP employment contract on September 28th?

10 Why else would he lie and tell IMSI that he was taking a break

11 between jobs the day after his October 30th start date with SAP

12 was confirmed?

13     Defendant's claim that he did not read the one-page

14 agreement he signed twice with a heading in bold letters

15 stating Noncompete is not credible, but it is also irrelevant,

16 as parties are, number one, presumed to have read the

17 agreements they sign, and, number two, it's simply not an issue

18 for this Court to decide under the Joint Final Pretrial Order.

19     Plaintiff gave the Defendant the valuable guidance and

20 support you saw, and he took advantage of it by taking

21 Plaintiff's customer, in direct violation of his simple

22 noncompete, which the Court has already held to be reasonable

23 in geographic scope and duration and line of business as it

24 only restricted him from working with one company, the

25 end-client.

1    Defendant's testimony about immigration fees he claims to
2  have paid is not relevant to whether the noncompete protects a
3  reasonable competitive business interest.  There is no defense
4  or cause of action before this Court that that testimony
5  supports.  The only issue payment of fees could relate to are
6  the amount of costs Plaintiff seeks to recover, which are only
7  $4,000, as described on Exhibit 35, which is a small fraction
8  of the damages Plaintiff has proven by a preponderance of
9  evidence in this case.

10    Plaintiff has satisfied his burden of showing a breach by
11  a preponderance of the evidence because the Defendant's breach
12  of the noncompete is not disputed.  Defendant admits he
13  accepted employment with Plaintiff's customer during the term
14  of the noncompete.

15    Other defenses Defendant has alluded to, that he was
16  forced to sign the agreement, didn't read it or the suggestion
17  that the noncompete was unconscionable are, one, not credible
18  and, more importantly, are not before this Court.  They do not
19  relate to the legal question of whether the noncompete protects
20  a reasonable competitive business interest.  To consider other
21  contract defenses that are not in the Joint Final Pretrial
22  Order would constitute an unfair and prejudicial trial by
23  ambush, as the parties agreed and this Court has ordered, that
24  the scope of this trial is limited to the issues set forth in
25  the Joint Final Pretrial Order.

1    Moreover, even if the Court had been asked to consider

2 other contract defenses, which, to be clear, it has not been

3 asked to do, the Court has already rightly ruled in its order

4 striking the jury demand in this case that "defendant's signing

5 of the employment agreement was knowingly and voluntary."

6    Whether defendant incurred minor fees in connection with

7 immigration processes or travel expenses is simply not what

8 this lawsuit is about.  It has no relevance to the one breach

9 of contact claim before this Court, and, more specifically,

10 there is no relevance to the one defense asserted to that

11 claim, which is Defendant's assertion that the noncompete did

12 not protect a reasonable competitive business interest.

13    Whether Defendant paid immigration fees also has no

14 relevance to whether the liquidated damages clause was an

15 honest attempt to calculate uncertain damages arising from a

16 breach at the time the agreement was made.  Again, the only

17 two issues before this Court are whether the noncompete

18 protects a reasonable competitive business interest and what

19 damages are owed.

20    As enforceability of the noncompete is a legal question,

21 the only question of fact for the Court to decide is the amount

22 of damages to award Defendant -- excuse me -- to award for

23 Defendant's admitted breach of the contract he admits he

24 signed.

25    IMSI has shown its damages by a preponderance of the

1    evidence.  IMSI is not required to prove its damages with

2    mathematical precision because it is not always possible that a

3    party can prove the exact amount of its damages.  Therefore,

4    it's only necessary that IMSI prove its damages "to a

5    reasonable certainty or reasonable probability."  That's from

6    Michigan Civil Jury Instructions 142.30.

7         Each category of damages here has been proven by a

8    reasonable probability.  First, the employment agreement states

9    that Plaintiff may recover any and all damages, costs and

10   expenses, including actual attorney's fees, incurred by

11   Plaintiff and liquidated damages equal to two years of gross

12   margin based on IMSI project billing rate to cover for loss of

13   business.

14        The liquidated damages clause is enforceable because it

15   was an honest attempt to estimate damages arising from the

16   breach at the time the contract was entered into.

17        In *Nichols v. Seaks*, 296 Mich 154 at 161, the Michigan

18   Supreme Court held that "Where damages are difficult of

19   ascertainment, courts will respect the honest attempt of the

20   parties themselves to compute as best they can the just

21   compensation from loss of the bargain by breach."

22        Here, Plaintiff expected that Defendant would continue

23   working for Plaintiff for at least two years.  Defendant's

24   assertion that the placement was expected to end in three to

25   six months was a completely irrelevant red herring.  First of

1    all, that did not prove true.  Defendant has been employed at

2    SAP for over four years.  Defendant continues to be employed

3    there to this day and started his -- started working there as

4    an employee of IMSI in April of 2017.

5         And, Defendant himself testified that he "never had a

6    second thought" of leaving IMSI.  That's Volume II of the

7    transcript, Page 123, Lines 18 to 19.  Defendant said --

8    defendant testified, "So on the day I signed the contract I

9    never had a second thought of leaving IMSI on that day."

10        Moreover, Mr. Jain and Mr. Makhecha both testified at

11   length that based on their many years of experience projects

12   very often budget three to six months and turn out to last for

13   many years.  In this case that in fact proved true; the

14   Defendant still works at SAP.

15        Clearly, the expectation of both parties at the time the

16   contract was made was that they would have a long and

17   successful relationship.  That's corroborated by Defendant's

18   own testimony.

19        Therefore, the liquidated damages clause was an honest

20   attempt and a reasonable attempt to calculate those uncertain

21   damages.  Plaintiff's liquidated damages are 115,000 -- excuse

22   me, $115,772.80.  The calculation is simple and is as follows:

23        Plaintiff invoiced its end-client, SAP, at an hourly rate

24   of $91.20 for Defendant's services.  That's shown on

25   Exhibit 29.

1    Plaintiff paid Defendant $63.37 per hour for a gross

2  margin of $27.83 per hour.  That's shown on Exhibit 1.

3    The employment agreement contemplated 2,080 annual hours,

4  which is simply 52 weeks at 40 hours per week.  It's also shown

5  on Exhibit 1.

6    Thus, two years of gross margin is 2 multiplied by 2,080

7  annual hours times $27.83 per hour, which equals $115,772.80.

8    Alternatively, expectation damages are appropriate.

9  Michigan Civil Jury Instruction 142.32 permits recovery of lost

10  profit for breach of contract and notes that they are a type of

11  benefit-of-the-bargain damages.  That jury instruction states

12  that "Damages for breach of contract may include lost profits.

13  Lost profits may be recovered for a breach a contract if it is

14  reasonably probable that the profits would have been earned

15  except for the breach, the amount of loss can be shown with a

16  reasonable degree of certainty, and there is a reliable basis

17  in the evidence for computing the lost profits."

18    Those three criteria are satisfied here.  The

19  reasonableness of the liquidated damages clause is in fact

20  amplified by the fact that Plaintiff's expectation damages are

21  much greater than the liquidated damages.  Plaintiff's

22  expectation damages arising out of Defendant's breach would be

23  the amount of gross margin Plaintiff expected to receive for

24  the duration of Defendant's employment.

25    The fact that Defendant has continued working with SAP for

1   over four years since -- and three and-a-half years since

2   breaching the employment agreement on October 27, 2017, means

3   that the expectation damages are 3.5 times 2,080 annual hours

4   times $27.83, which equals $202,602.40.

5        So whether the Court enforces the parties' bargain as

6   written and their honest effort to calculate at the time of

7   contracting what the damages arising from the breach would be

8   or whether the Court awards expectation damages, one or the

9   other is appropriate.

10       Plaintiff's costs are also expressly recoverable under the

11  contract.  Those are $19,100 as shown on Exhibit 35.  In that

12  exhibit Plaintiff prepared a detailed accounting of the time

13  and services it provided to defendant from August 22, 2013,

14  through October 27, 2017, based on its business records.

15       Plaintiff spent at least $4,000 on immigration fees for

16  Defendant, which Defendant did not reimburse Plaintiff, and at

17  least 302 hours of completing applications, paperwork,

18  communications related to Defendant's visa and job placement.

19  Applying a very, very conservatively low estimated value of $50

20  per hour for Plaintiff's time, Plaintiff invested $15,100 in

21  helping Defendant with his visa and job placement.

22       Combined with the $4,000 in immigration fees, Plaintiff's

23  costs and expenses incurred in assisting Defendant and

24  providing him what he calls the valuable guidance and support

25  that enabled him to come to United States is a total of

1  $19,100.

2      Finally, attorney's fees are also expressly recoverable

3  under the contract.  Attorney's fees through April 26 of

4  2021 -- Plaintiff's attorney's fees through April 26, 2021 are

5  $75,589.04 and have increased since that date.  That's shown on

6  Exhibit 34.

7      And that's all I have other than to thank the Court for

8  its time and to thank all of the witnesses and opposing counsel

9  for their professionalism and attention.

10      **THE COURT:**  Thank you very much, Mr. Rhoades.

11      Let's see.  Ms. Adams.

12      You're on mute though, Ms. Adams.

13      **MS. ADAMS:**  Thank you.

14      Over the course of the past three, three days of

15  testimony, Defendant still maintains that Plaintiff has failed

16  to identify a reasonable competitive business interest under

17  Michigan law to enforce a noncompete agreement against him.

18      Despite Plaintiff stating that they have a business

19  interest in goodwill and customer relationships, their contract

20  states that their sole interest is in protecting their role as

21  an intermediary.

22      As established through testimony, Defendant initiated and

23  facilitated the relationship between Plaintiff and SAP.

24  Therefore, the evidence has showed that no reasonable

25  competitive business interest has been -- was mis -- was being

misappropriated by Defendant.  Furthermore, Plaintiff has not

suffered any irreparable harm, as they have chosen not to work

with SAP due to this "dispute" per Plaintiff's testimony, nor

has Defendant gained an unfair competitive advantage against

Plaintiff.

Defendant asks that this Court looks to *Teachout Security

Services v. Thomas*, a Michigan Appellate Court case from 2010

that, although it is unpublished, the Court refused to enforce

a one-year noncompete restriction against security guards in

that case because there was no confidential information and had

only received limited training from the employer, which was a

temporary staffing agency that staffed security guards.

The legal argument in that case was identical to the

Plaintiff's here, and that was that their position as a

middleman should be a protectable interest and their employee

should not be permitted to leave its employ and then cut it out

of the process.

The Court of Appeals in that case disagreed, recognizing

that no Michigan court has decided "disintermediation as a

reasonable competitive business interest to eliminate

competition of former employers."

Furthermore, the *Teachout* court concluded that "[U]nder

the circumstances of this case, where the knowledge acquired by

defendants ... is merely general knowledge accumulated in their

day-to-day positions, recognizing plaintiff's claim of

1  disintermediation as a reasonable interest would come into

2  conflict with the biding Michigan common law ..."

3      In this case the Defendant maintains that he did not

4  receive any necessarily specific knowledge in his job or his

5  assignment with SAP.  He applied for a position that was

6  available to the general public.  He participated in an

7  in-depth interview process, as he testified to, as well as he

8  competed against other applicants for that job.

9      And, furthermore, in *Teachout* it cited *Follmer v. Kosco*,

10  and it stated that it has been -- as previously stated, "that

11  general knowledge, skill or facility acquired through training

12  or experience while working for an employer appertain

13  exclusively to that employee."  Furthermore, it states,

14  "... even though the on-the-job training has been extensive and

15  costly."

16      Defendant -- I'm sorry, Plaintiff maintains that it's --

17  as stated in its employment agreement, that their consideration

18  for their noncompete is based upon their significant investment

19  of time and expense on employee's immigration and visa

20  assistance.  However, there's been extensive testimony as well

21  as exhibits that demonstrate that the Defendant in this matter

22  has provided the Plaintiff with nearly $20,000 in fees to go

23  towards his immigration costs.  Therefore, their stance that --

24  therefore, their initial assertion that they invested

25  significant resources for Defendant's immigration process has

1    been sufficiently diminished over the past three days.

2         Furthermore, regarding the -- therefore, based on the

3    above, Defendant maintains that Plaintiff has the

4    misapplication of a noncompete agreement and it's solely to

5    prohibit competition and serve as a restraint in trade and to

6    prevent a reduction in their profits as a middleman and does

7    not satisfy enforcement under Michigan law, statutory and case,

8    nor public policy.

9         And then, regarding Plaintiff's claim for liquidated

10   damages, Plaintiff's liquidated damages are unreasonable and

11   unconscionable and serve as a penalty under state and federal

12   law.  By highlighting the characteristics of damages sought and

13   the conditions existing at the time of the contract, including,

14   but not limited to, the fact that this assignment had a finite

15   duration of three to six months, which was known to all

16   concerned parties and acknowledged by Plaintiff despite their

17   testimony that temporary positions last around five years.  We

18   respectfully request that the Court look at what was expected

19   at the time of the contract.

20        Furthermore, under federal law an employer may not require

21   an H-1B employee to pay a penalty for ceasing employment with

22   the employer prior to an agreed-upon date between the two.

23   However, Defendant does admit that the employer may receive a

24   bona fide liquidated damages from him if he were to end

25   employment early.  Therefore, the distinction between allowable

1  liquidated damages and non-allowable penalty is to be made on

2  the basis of Michigan law.

3      And in Michigan if the liquidated damages amount

4  stipulated is reasonable with relation to the possible injury

5  suffered, the courts will sustain such a stipulation, *Curran v.*

6  *Williams*.

7      Additionally, there is a primary limit on enforceability

8  for liquidated damages -- additionally, the primary limit on

9  enforceability for liquidated damages is a requirement for

10  reasonableness. *St. Clair Med, PC v. Borgiel*, and that's a

11  Michigan appellate case.

12      Furthermore, the validity and reasonableness of a

13  liquidated damage provision is determined by conditions

14  existing at the time the contract was the entered into, not

15  when a breach occurs.

16      And in this case the testimony and exhibits have shown

17  that the defendant paid and/or reimbursed his visa fees at the

18  time, which may or may not be illegal.

19      Furthermore, it has to be admitted that there is a

20  significant inequality of bargaining power between the parties.

21  On one side we have a staffing agency and then on the other

22  side we have an employee who, as Plaintiff has admitted, just

23  like similar employees, is new to the country and is not very

24  well aware as to what's going on as far as business matters.

25      Furthermore, I will reiterate that this liquidated damage

1   clause is seeking to enforce a penalty opposed to a liquidated

2   damage, which is in violation of Michigan law and federal

3   immigration.

4       Furthermore, the project billing rate did have a finite

5   duration of three to six months, and that was reflected in the

6   emails from SAP to Plaintiff.

7       And Plaintiff did admit that Defendant did not, did not

8   participate in Plaintiff's billing rates nor gross profit

9   margins.  Therefore, he did not have a say in the gross profits

10  that are being utilized for the liquidated damages.

11      Therefore, these conditions are woefully one-sided in

12  favor of Plaintiff and should not constitute Plaintiff's

13  liquidated damages provision being valid and reasonable.

14      Furthermore, the Department of Labor additionally has

15  characteristics of a penalty opposed to a liquidated damage

16  against H-1B employees, and it should be noted that under

17  federal law H-1B employees are afforded special protection so

18  that they are not subjected to servitude and coercion.

19  Therefore, while the liquidated damages penalty may be typical

20  for all employees, immigration law does impose a further

21  restriction that employers may not recover their normal

22  business expenses from an H-1B employee like Defendant.

23      And, according to the Department of Labor, a penalty would

24  be a fixed termination payment regardless of the term of the

25  contract and the length of the time during which the contract

1  was in effect before termination.

2       In this case Plaintiff's damages are not based on a

3  sliding scale.  They don't consider the fact that Defendant did

4  work for six months and satisfied the anticipated three- to

5  six-month contract.  Instead, they are based upon a minimum of

6  24 months.

7       Furthermore, the Department of Labor deems illegal --

8  furthermore, the Department of Labor deems a penalty to be an

9  unexplained or unjustified amount of money which is not

10 attributed to any particular cost or loss.

11      In this case damages are equal to two years gross profits

12 for a billable rate that was not known to the Defendant with a

13 finite duration of three to six months.

14      Next, the Department of Labor considers an amount of money

15 which appears unreasonable in comparison to the worker's

16 earnings.  In this case the damages sought are equivalent to

17 Defendant's gross salary, and furthermore, they exceed any

18 sustainable profits SAP would have received due to the

19 project's finite duration.

20      Therefore, based on those factors, IMSI's liquidated

21 damage clause is in fact a penalty.

22      Defendant was a temporary and contract employee.  There is

23 no guarantee that he was going to work at SAP as a contract

24 employee for more than those three to six months.  Therefore,

25 the plaintiff's alleged damages bear no reasonable relationship

1  to the actual damages suffered, if any, and these damages would

2  be an excessive windfall because the project billing rate at

3  issue was already lost regardless of Defendant's termination of

4  employment.

5      As a result, Plaintiff's liquidated damages clause is

6  unreasonable and unconscionable in relation to the harm

7  suffered to Plaintiff and should thereby be deemed void and

8  unenforceable by this Court under state and federal law.

9          **MR. RHOADES:**  I would like to make just a --

10         **THE COURT:**  Well, wait a minute.  Let's see if

11  Ms. Adams is finished.

12         **MS. ADAMS:**  Oh, and we respectfully request that this

13  Court find a judgment of no cause of action in this matter and

14  denies all of Plaintiff's requests for monetary damages and any

15  associated fees pursuant to the employment agreement at issue

16  and grant any such relief this Court may deem favorable for

17  Defendant.

18         **THE COURT:**  Okay.  Thank you.

19      Would you like to have a rebuttal, Mr. Rhoades?

20         **MR. RHOADES:**  Yes, please, Your Honor, very briefly.

21         **THE COURT:**  Okay.

22         **MR. RHOADES:**  So just a few points.  Number one, the

23  *Teachout* case, as we have noted in the opening statement and in

24  briefs before this Court, that case involved -- one, it's

25  unpublished, but it involves confidential information allegedly

1    held by security guards that had several hours of training,

2    about 16 hours of training, and the Court of Appeals in that

3    per curiam unpublished opinion deemed that confidentiality was

4    not a reasonable competitive business interest with such

5    minimal amount of training when those workers went from

6    one security firm to a competing security firm.

7         So that's not the same facts of this case or really

8    anything like it where an employee directly took a customer

9    relationship, and it's also different because what the -- what

10   is being appropriated in this case is the customer relationship

11   itself and the goodwill, the investment of time and the

12   employee resource.  Those are -- so it's not a -- it's unlike

13   *Teachout* for a variety of reasons, even if that, even if that

14   opinion were published.

15        In terms of bargaining power, I mean the Defendant in this

16   case is a very sophisticated, intelligent, well-paid IT

17   professional.  He's making over $140,000 a year.  He certainly

18   had the ability to negotiate.  He came to IMSI for help.  He

19   admits they assisted him every step of the way and provided him

20   valuable guidance and support.  He certainly could have read

21   the one-page agreement that he signed twice.

22        In terms of the liquidated damages, again, that was an

23   honest attempt to estimate uncertain damages at the time it was

24   entered into, and again, Defendant admits that he never gave

25   leaving IMSI a second thought.  Those are his -- that's his

1  testimony.

2      So at the time the contract was signed in April of 2017

3  Defendant testifies that he never gave leaving a

4  second thought, and the Plaintiff has testified that these

5  positions are often extended more than three to six months,

6  but, again, that three- to six-month argument is a red herring

7  because, even if the position had ended in three to six months,

8  the expectation was that the Defendant would remain IMSI's

9  employee.  They would have just found him another opportunity.

10  It doesn't matter if that -- he didn't have to stay at SAP.  If

11  that project ended in three months, he was still bound by the

12  agreement that he signed and he would have moved to a different

13  opportunity.

14      Now, of course the facts show that Defendant -- that that

15  opportunity did not expire in three to six months.  In fact,

16  Defendant's own sworn affidavit in this case shows that the

17  opportunity has gone on for more than four years so that would

18  be the proper measure of expectation damages even if the Court

19  were for some reason to find the liquidated damages clause

20  unenforceable.

21      And, again, the payment of immigration fees and these

22  assertions or suggestions that something illegal was done are

23  not relevant to the issues before this Court of whether the

24  noncompete protects a reasonable competitive business interest

25  and what damages are owed.

1      **THE COURT:** Okay. Thank you. Do you propose to
2   offer any further -- anything further like proposed findings of
3   fact and conclusions of law or anything like that?
4      **MS. ADAMS:** I thought that was ordered.
5      **MR. RHOADES:** In the Joint Final Pretrial Order I
6   think we have post-trial briefs due a week from today?
7      **THE COURT:** Okay.
8      **MR. RHOADES:** I would have to pull that up.
9      **THE COURT:** All right. So then you will follow that,
10  and then I'll issue the Court's findings of facts and
11  conclusions of law after you submit them.
12     **MS. ADAMS:** Is it a week from today or a week from
13  tomorrow?
14     **THE COURT:** Well, you can have a week from tomorrow.
15  I think that would be okay, and we'll tell you the date to make
16  it easier. Okay?
17     **MS. ADAMS:** Even if it were a week from Monday that
18  would be fine, too.
19     **THE COURT:** Let's make it a week from tomorrow. What
20  would that be, Mr. Carroll?
21     **THE CLERK:** That would be May 21st.
22     **THE COURT:** Okay. May 21st.
23     **MS. ADAMS:** And this is the post-trial brief?
24     **THE COURT:** Right, and anything else required by the
25  Joint Final Pretrial. The 21st is -- yes, I was going to say

1    that was a holiday weekend, but it's not -- it's the next week

2    that is -- so May 21st is fine.  All right?

3         Anything further we need to take up today?

4         Now, you know you have those two big exhibits that we have

5    referred to as Exhibit 3 or I think it's 4 or 35, and then we

6    have said it's like 20 pages in, Judge, okay?  So if you're

7    going to cite that anywhere, you need to cite it with some

8    particularity, okay?

9              **MS. ADAMS:**  Okay.

10             **THE COURT:**  So the Court will be able to find it.

11   All right?

12             **MR. RHOADES:**  Understood.

13             **THE COURT:**  All right.  Very good.  Anything else

14   today?

15             **MR. RHOADES:**  Not from the Plaintiff, Your Honor.

16             **THE COURT:**  Okay.  Then I appreciate your clients

17   being present, and I appreciate the arguments of counsel as

18   well, and I'll get something back to you after you send me your

19   post briefs.  Okay?

20             **MR. RHOADES:**  Thank you, Judge.

21             **MS. ADAMS:**  Thank you.

22             **THE COURT:**  All right.  Thank you, and this matter is

23   in recess.

24        (Proceedings concluded at 1:19 p.m.)

25                        -   -   -

1    **C E R T I F I C A T I O N**

2        I certify that the foregoing is a correct transcription of

3    the record of proceedings in the above-entitled matter.

4

5    s/ Sheri K. Ward                              5/19/2021
     Sheri K. Ward                                Date
6    Official Court Reporter

7                          -     -     -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25